UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICHELLE BROWN, | ) CASE NO. 1:17-cv-1309 |
| Plaintiff, | ) |
| | ) |
| | ) MAGISTRATE JUDGE |
| v. | ) THOMAS M. PARKER |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) **MEMORANDUM OF OPINION** |
| | ) **AND ORDER** |
| | ) |
| Defendant. | ) |
| | ) |

**I.      Introduction**

Plaintiff, Michelle Brown, seeks judicial review of the final decision of the Commissioner of Social Security denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act ("Act"). The parties consented to my jurisdiction. ECF Doc. 14.

Because the ALJ supported his decision with substantial evidence and applied the correct legal standards, the final decision of the Commissioner must be AFFIRMED.

**II.     Procedural History**

Brown previously filed for SSI and for disability insurance benefits in August 2008, alleging an onset date of April 24, 2008. (Tr. 141) Brown's first disability claim was denied initially and on reconsideration. (Tr. 141) On February 25, 2011, Administrative Law Judge ("ALJ") Gary J. Suttles determined that Brown had severe impairments of sleep apnea, bilateral knee arthritis, hypertension and obesity. (Tr. 143) ALJ Suttles found that Brown had the residual functional capacity to perform a limited range of sedentary work and that she could

perform her past work as a customer service representative. (Tr. 141-148) The Appeals Council denied Brown's request for further review and this court affirmed the Commissioner's conclusions on March 8, 2013. *Brown v. Comm'r of Soc. Sec. Admin.,* No. 1:12-cv-1915, 2013 WL 872404, at *1 (N.D. Ohio March 8, 2013) (Magistrate Judge Limbert).

Brown re-filed for both Title II and Title XVI disability benefits in March 2011. (Tr. 165) ALJ Traci Hixon denied Brown's second application for benefits on May 24, 2013. (Tr. 165-177) ALJ Hixson found that new and material evidence regarding Brown's back, knee, and foot pain supported the conclusion that she would have greater limitations than were established in the prior ALJ's decision. (Tr. 168-176) ALJ Hixson found that Brown could perform a limited range of sedentary work. (Tr. 171) She considered Brown's testimony that she required a cane or crutches for balance. (Tr. 172) ALJ Hixson found that Brown was able to perform her past relevant work as a telemarketer and appointment setter. (Tr. 176) The Appeals Council denied Brown's request for review (Tr. 183-188), and this court affirmed the Commissioner's decision. *Brown v. Colvin,* No. 1:14-cv-2410, 2016 WL 1071103 at *1 (N.D. Ohio Mar. 17, 2016) (Judge Nugent/Magistrate Judge Limbert)

Brown filed the instant protective application for SSI benefits on December 12, 2014 alleging a disability onset date of October 20, 2014. (Tr. 258) After Brown's disability application was denied initially and on reconsideration, (Tr. 189-212, 225-229) she requested an administrative hearing. (Tr. 230) ALJ Keith J. Kearney heard the case on August 9, 2016 (Tr. 115-137) and denied Brown's claim ion August 24, 2016. (Tr. 91-103) The Appeals Council denied review on June 1, 2017, rendering the ALJ's decision final. (Tr. 1-4) Brown filed this action to challenge the Commissioner's final decision. ECF Doc. 1.

**III. Evidence**

**A. Personal, Educational and Vocational Evidence**

Brown was 54 years old on her alleged onset date. (Tr. 200) She graduated from high school, had an Associate's Degree in paralegal work, and a certificate in medical coding and billing. (Tr. 485) Plaintiff's past work included telemarketing and a job scheduling medical appointments. (Tr. 102, 485)

**B. Medical Evidence[1]**

On May 30, 2014, Brown saw rheumatologist Bijal Jayakar, M.D. (Tr. 366-370) Physical examination showed normal gait, sensation, muscle strength and stable joints; but limited range of motion in the shoulders and knees due to pain. (Tr. 368-369) Dr. Jayakar found 11 out of 18 tender points for fibromyalgia. (Tr. 369) He noted that Brown did not exhibit symptoms of an acute gout attack, and that gout was not "crystal proven at this time." (Tr. 369-370) He recommended x-rays of the knees and shoulders; cortisone shots (which she declined); physical therapy; weight loss; and checking of her uric acid levels. (Tr. 370)

X-rays of Brown's shoulders taken on May 30, 2014 showed mild degenerative disc disease of the bilateral acromioclavicular joint space with bursa side osteophytes. (Tr. 349-350) Otherwise, there were no acute findings. (Tr. 349-350) The same day, x-rays of the knees showed severe bilateral medial and patellofemoral compartment narrowing, left greater than right. (Tr. 347-348)

On June 9, 2014, Brown saw Garrett LaSalle, M.D., (Tr. 332, 352) Examination showed diffuse tenderness on palpation over both knees. There was no objective pathology on testing.

---

[1] In her December 2014 application, Brown alleges a disability onset date of October 20, 2014. (Tr. 258) The Commissioner has pointed out that some of the medical evidence in the record pre-dates the onset date. ECF Doc. 18, Page ID# 580.

3

Brown had full strength throughout her lower extremities. (Tr. 331) Based on the imaging, Dr. LaSalle diagnosed bilateral knee osteoarthritis. He felt that significant obesity contributed to Brown's pain. (Tr. 332) Dr. LaSalle referred Brown to physical therapy; offered steroid injections of her knees (which she refused); and ordered knee braces. (Tr. 332-334) He told her he would address her shoulder pain on a subsequent office visit. (Tr. 332)

On June 25, 2014, Brown called Dr. Jayakar's office and said she was having a gout flare-up in her left big toe. He prescribed colchicine and allopurinol and ordered testing of her uric acid level on a monthly basis. (Tr. 362)

A July 7, 2014 MRI showed degenerative changes from Brown's T1 down to her L5 discs. Degenerative changes were most severe at L4-L5, L5-S1, and T11-12, where the MRI showed disc bulging, loss of disc height, moderate foraminal and canal narrowing and facet hypertrophy. (Tr. 340-41) Brown called Dr. LaSalle's office after the MRI study, seeking the results. Dr. LaSalle informed Brown that "the MRI showed arthritis (but this is common in anyone over 40 years old, so it is nothing worrisome.) There was no compression of nerves or the spinal cord noted." (Tr. 359)

On September 25, 2014, Brown established care with Elizabeth Habjan, M.D. (Tr. 357) Brown had begun using a cane. Brown told Dr. Habjan that the anti-inflammatory medication Diclofenac was not helping and she still had severe pain in both knees. Physical examination findings were mostly normal except for mild edema in the lower legs. Brown had normal range of motion and muscle tone, and no tenderness. Dr. Habjan prescribed medication for hypertension; allopurinol for gout; diclofenac sodium for degenerative joint disease; albuterol for sleep apnea; and Vitamin D. (Tr. 358)

4

Brown returned to see Dr. LaSalle on February 16, 2015. Dr. LaSalle noted that Brown had not returned for a follow up appointment for chronic low back pain and right shoulder pain. She had not visited bariatric medicine or physical therapy as recommended and she had not followed up with rheumatology in May 2014. Brown had limitation of abduction of the right shoulder to approximately 110 degrees before she showed significant limitation secondary to pain. She had reproduction for pain in the right shoulder with internal rotation of the shoulder. She was positive for Neer test and empty-can test. Dr. LaSalle felt that testing was clinically consistent with a rotator cuff pathology, though May 2014 imaging demonstrated no acute pathology. Brown's knee pain had been present for approximately eight years and history and imaging were consistent with osteoarthritis of both knees. Brown had had low back pain for approximately seven years and previously had no historical or physical exam consistent with myelopathy, cauda equine syndrome or radiculopathy. (Tr. 429) Dr. LaSalle restated his previous recommendations and referrals and told Brown to return in six weeks. (Tr. 430)

A lab panel performed on March 19, 2015 showed elevated uric acid levels at 8.6. Normal levels are between 2.0 and 7.0. (Tr. 416)

On April 10, 2015, x-rays of the knees showed tricompartmental degenerative changes greater in the medial and patellofemoral compartments with subchondral sclerosis, osteophyte formation, and loss of the joint space. There was no joint effusion or soft tissue swelling. (Tr. 420-422)

On April 22, 2015, Brown met with orthopedist Audrey Mackel, M.D., for knee pain. Brown told Dr. Mackel that her knee pain was chronic and affected her ability to sleep, to perform everyday tasks such as walking up or down stairs, to do housework and to stand from a seated position. Physical examination showed that Brown's knees were stable with normal

5

strength and muscle tone, varus deformity, medial and lateral joint line tenderness, and lateral patellar tenderness. Dr. Mackel noted crepitus in both knees with flexion and extension. (Tr. 452) Dr. Mackel referred Brown to physical therapy. (Tr. 453)

Brown returned to Dr. LaSalle on November 2, 2015, nine months after her last appointment. However, she left the office before seeing the doctor. (Tr. 436) Later, a nurse called her and referred her to an orthopedist, recommended repeat x-rays, referred her again to physical therapy, and prescribed a lidocaine ointment. (Tr. 436) A few days later, an x-ray of the right shoulder showed degenerative joint disease of the acromioclavicular joint. Well-corticated ossific density seen adjacent to the greater tuberosity suggested calcific tendinitis. There was no acute fracture or dislocation, and a normal acromiohumeral interval and glenohumeral joint space. (Tr. 442)

Brown went to the Cleveland Clinic emergency department on December 15, 2015 complaining of shortness of breath. (Tr. 444-445) Brown was noted as morbidly obese; she had an antalgic gait and ambulated with a cane. She was found to have hypertension, swelling and heart palpitations and was referred to the cardiology department. (Tr. 445-447)

On April 11, 2016, Brown returned to Dr. LaSalle with multiple pain complaints, asserting it was most severe in her knees. Dr. LaSalle told her she was not a candidate for knee surgery until she lost weight. (Tr. 474) Brown declined injection therapy for her knee pain. She was noted to be well appearing and in no distress, with no evidence of effusions in the knees. (Tr. 475) Dr. LaSalle prescribed Cymbalta and ordered knee braces. (Tr. 475-476)

In April 2016, Dr. LaSalle referred Brown to the Cleveland Clinic's Department of Behavioral Medicine. (Tr. 483) During her intake evaluation with Stanley Fireman, LISW, Brown shared that she had been sexually abused as a child, but did not want to discuss her

6

traumatic experience in detail. (Tr. 484) Brown also stated that she experienced mood changes, feelings of frustration, anxiety, depression, anger, and trouble with sleeping. She had difficulty concentrating and appeared tearful, depressed, and angry during parts of the evaluation. Mr. Fireman also noted that Brown's gait was "extremely slow and labored." Brown admitted that she required help from her family members with everyday tasks such as showering and with most household chores. (Tr. 485) Mr. Fireman recommended that Brown return for psychological counseling due to the severity of her psychological symptoms. (Tr. 486)

### C. Opinion Evidence

#### 1. State Agency Reviewing Physicians

On February 5, 2015 Elaine Lewis, M.D., reviewed Brown's records including shoulder and knee x-rays from May 2014 and completed an RFC assessment. (Tr. 192-196) She noted severe impairments of sleep-related breathing disorders, osteoarthritis, spine disorders, essential hypertension, and obesity. (Tr. 192-193) Dr. Lewis then adopted the RFC assessment from ALJ Hixson's May 2013 decision. (Tr. 192-196)

On May 22, 2015, Michael Lehv, M.D., reviewed Brown's records, including the April 2015 x-rays of Brown's knees, and completed an RFC assessment. (Tr. 205-209) Dr. Lehv also adopted the RFC assessment from ALJ Hixson's May 2013 decision.

#### 2. Margaret Kravanya, D.O. - January 2016

On January 25, 2016, Dr. Margaret Kravanya completed a medical source statement regarding Brown's physical functional capacity.[2] (Tr. 424-425) Dr. Kravanya opined that

---

[2] Dr. Kravanya had a past treatment relationship with Brown. However, by January 2016 when Dr. Kravanya completed the medical source statement, she was no longer treating Brown. The record reveals Dr. Kravanya had not seen Browns since July 21, 2013. The check-box form she completed in January 2016 was similar to a form she completed in November 2012 in support of Brown's prior application. (Tr. 101)

7

Brown had significant limitations in almost all aspects of her physical functioning. She opined that Brown was able to occasionally lift five pounds; couldn't stand or walk at all; and could sit without interruption for fifteen minutes. She opined that Brown could rarely climb, balance, stoop, crouch, kneel, and crawl. (Tr. 424) Dr. Kravanya described Brown's pain as severe. She opined that Brown was only occasionally able to reach, push, pull, or perform tasks requiring gross or fine manipulation. She also opined that Brown was unable to perform repetitive, or sustained activities because of her decreased range of motion in her spine shoulder and knees. She also stated that Brown would need to take additional breaks "all day." (Tr. 25) Dr. Kravanya attributed these limitations to degenerative arthritis, gait abnormality, decreased range of motion in Brown's shoulders, knees, and spine, postural imbalance, decreased spinal range of motion, and morbid obesity. (Tr. 424)

    **D.**    **Testimonial Evidence**

        **1.**    **Testimony of Ms. Brown**

Brown testified that, since her 2013 hearing, her pain had gotten progressively worse. (Tr. 123, 128) She had a hard time taking care of herself due to pain. She could not wash the dishes or prepare meals. Her husband was rarely home, and she did not have much help around the house. (Tr. 123, 132) She spent most of her day lying around. (Tr. 124, 126) She listened to the radio, watched television, or read. (Tr. 124, 133) She used a cane and a walker. (Tr. 124) Nothing relieved her constant pain, and it got worse when she stood or walked. (Tr. 126)

Brown had pain in her right shoulder due to arthritis and a rotator-cuff issue. (Tr. 129) It was difficult to raise her arm straight out and worse to lift it over her head. (Tr. 130) She had difficulty lifting things and taking a shower. (Tr. 129-130) Brown said she took medicine for

8

hypertension, Cymbalta for pain and depression, ibuprofen for pain, lidocaine ointment for pain in her knees, allopurinol for gout, and used an inhaler for breathing. (Tr. 133-134)

### 2. Vocational Expert's Testimony

A vocational expert, Deborah Lee, also testified. (Tr. 135) Ms. Lee testified that an individual who was off task 20% of the time due to pain would not be able to work. (Tr. 135)

## IV. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[3]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow the five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at

---

[3] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

9

least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## V. The ALJ's Decision

The ALJ's August 24, 2016 decision contained the following findings relevant to this appeal:

1. Ms. Brown had not engaged in substantial gainful activity since October 20, 2014, the alleged onset date. (Tr. 94)

2. She had severe impairments: obstructive sleep apnea; bilateral knee osteoarthritis; lumbar spine osteoarthritis; bilateral shoulder degenerative joint disease; hypertension; and obesity. And he found that gout was not a severe impairment. (Tr. 94)

4. ALJ Kearney adopted the conclusions of the prior ALJ finding that Brown had the residual functional capacity to perform sedentary work except that she would require the option to alternate between sitting and standing every hour for approximately 5 minutes without leaving the workstation; she could occasionally climb ramps and stairs, but could never climb ladders, ropes or scaffolds; she could only occasionally reach overhead, but could frequently handle, finger, and feel. She could not be exposed to concentrated pulmonary

irritants; could not work around hazardous conditions; and would require the use of a cane when standing and walking. (Tr. 97)

5. Brown was capable of performing past relevant work as a telemarketer and appointment setter. (Tr. 102)

Based on his six findings, the ALJ determined Brown had not been under a disability from October 20, 2014 through the date of his decision. (Tr. 103)

## VI. Law & Analysis

### A. Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the ALJ applied the correct legal standards. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also

support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether substantial evidence supported the Commissioner's decision, the court must determine whether proper legal standards were applied. Reversal is mandatory when incorrect legal standards are applied. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

B.  **Residual Functional Capacity and *Drummond* Analysis**

Plaintiff argues that the ALJ erred in his application of *Drummond v. Comm'r,* 126 F.3d 837 (6th Cir. 1997) and Acquiescence Ruling 98-4(6) by concluding there was no new and material evidence of disability since Brown had last presented a claim for benefits. In *Drummond*, the Sixth Circuit held that prior non-appealed decisions of the Commissioner are binding on the claimant and the Commissioner unless new and material evidence or changes in the law require a different ruling. *Drummond*, 126 F.3d at 841. SSA Ruling 98-4(6), 1998 SSR LEXIS 5 therefore mandates:

> When adjudicating a subsequent disability claim with an adjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the adjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98-4(6), 1998 SSR LEXIS 5, *5, 1998 WL 283902, at *3.

Plaintiff bears the burden to show circumstances have changed since the prior ALJ's decision "by presenting new and material evidence of deterioration." *Drogowski v. Comm'r of Soc. Sec.,* 2011 U.S. Dist. LEXIS 115925, 2011 WL 4502988, at *8 (E.D. Mich.) report and recommendation adopted, 2011 U.S. Dist. LEXIS 110609, 2011 WL 4502955 (E.D. Mich.). New evidence is evidence that was "not in existence or available to the claimant at the time of the administrative proceeding that may have changed the outcome of the proceeding." *Coakley v. Comm'r of Soc. Sec.,* 2014 U.S. Dist. LEXIS 37448, at *55 (S.D. Ohio) (citing *Schmiedebusch v. Comm'r of Soc. Sec.*, 536 F. App'x 637, 647 (6th Cir. 2013)). Evidence is considered material if there is a reasonable probability that the Commissioner would have reached a different

decision if he or she had considered the new evidence. *Coakley*, 2014 U.S. Dist. LEXIS 37448, at *55 (citing *Sizemore v. Sec'y of Health & Human Servs.,* 865 F.2d 709, 711 (6th Cir. 1988)).

Here, plaintiff argues there was new, material evidence showing worsening arthritic degeneration of her shoulder and knees, and the new impairment of gout. However, this "new evidence" was similar to evidence introduced at her prior hearings and already considered by the Commissioner in the prior ALJ decisions. Thus, it is unlikely that the Commissioner would have reached a different decision even in light of the new evidence. Substantial evidence supported the ALJ's finding that there was no new and material evidence establishing a change in the claimant's residual functional capacity.

The ALJ's decision addressed each of Brown's alleged impairments and explained his finding that the evidence did not support a more restrictive RFC than the one assigned by ALJ Hixson in 2013. Regarding Brown's chronic back, knee and shoulder pain, the ALJ noted that there was no objective clinical evidence of worsening. Diagnostic imaging studies had remained essentially stable since the prior decision. The ALJ discussed x-ray and MRI studies from both before and after the previous decision which contained similar findings and which exhibited no acute changes over time. (Tr. 99) Brown disagrees, but the ALJ must evaluate the record before him; and, here, the conclusion is inescapable that the ALJ performed a thorough review of the record and explicitly discussed the very records Brown also argues about.

Similarly, the ALJ noted Brown's physical examinations showed little material change since the ALJ's 2013 decision. There was no evidence of greater loss of strength, sensation, reflexes, or other evidence of motor or neurological deficits. Brown was using a cane before and after the last decision. She continued to have some positive findings consistent with musculoskeletal pain including tenderness and range of motion difficulties in her shoulders, "but

14

there were no significant changes from the prior decision that would warrant additional postural or manipulative limitations." (Tr. 99) The ALJ also noted Brown's treatment regimen had remained essentially unchanged since the earlier claim denial. (Tr. 100)

Brown argues that the evidence showed a worsening of her shoulder condition. She points to x-rays taken in 2014 and in 2015 arguing that the later x-rays showed additional calcific tendinitis or an inflammation of the rotator cuff caused by buildup of calcium. (Tr. 472) However, despite this additional finding on the 2015 x-rays, Brown cites no evidence that this additional condition negatively impacted her functional capability. Brown also argues that Dr. LaSalle expressed that her shoulder had worsened in his treatment notes. (Tr. 429) But Dr. LaSalle's treatment notes are equivocal; it is unclear whether he observed a worsening condition. In his February 2015 treatment notes. And Dr. LaSalle noted that there were no acute findings in Brown's shoulder x-rays from May 2014. He stated that her complaints were consistent with rotator cuff pathology, but the x-rays which Brown now argues show objective findings consistent with rotator cuff pathology were not taken until November 2015, long after her February visit with Dr. LaSalle. Moreover, even with Dr. LaSalle's finding of rotator cuff dysfunction, there is no indication that this condition adversely impacted Brown's ability to function during the alleged disability period.

Moreover, as pointed out by the ALJ, Brown did not follow the treatment plan formed by Dr. LaSalle to address her complaints of pain. The ALJ noted that Brown only treated with Dr. LaSalle approximately every six months. He also noted that:

> [t]here has been no change in the frequency or intensity of the claimant's treatment that would signal a significant worsening of the claimant's symptoms and functional limitations. Generally, her treatment was conservative, and consistent with intermittent pain management visits with Dr. LaSalle, with no use of opioid pain medications. She continued to be noncompliant with referrals for physical, rheumatology (since May 2014), and bariatric treatment. In addition,

15

she continued to refuse treatment measures that would be expected to provide
relief of her pain, including epidural steroid injections and viscosupplementation,
citing only an aversion to needles as her resistance to this treatment, rather than
other limitations on access to this medical care.

(Tr. 100)

Regarding her knee pain, Brown cites a treatment note from Dr. LaSalle stating that her knee pain was gradually worsening. (Tr. 352) However, the cited note appears to be Brown's statement, not a finding by Dr. LaSalle. Brown further points to a prescription of Cymbalta and knee braces as evidence of worsening knee pain. However, as pointed out by the Commissioner, Dr. LaSalle prescribed Cymbalta in June 2014 – before her alleged onset date, but Brown did not fill her prescription and did not start taking it until 2016. (Tr. 332, 475) And knee braces had been prescribed prior to the 2013 ALJ decision; ALJ Hixson's decision mentioned them. (Tr. 173) Thus, the fact that Brown wore knee braces did not constitute new and material evidence that her knee condition had worsened.

Even Brown's own allegations regarding her disabilities had not changed significantly. The ALJ explained:

> During the prior application and appeal, the claimant alleged disability due to
> chronic widespread pain and swelling, which she testified affected her shoulders,
> knees, feet, and low back. The claimant reported that she could sit for
> approximately five minutes and stand for only one minute before needing to
> change positions or lie down, and she noted that she required a cane or crutches
> for balance at all times. Additionally, she stated that her symptoms had worsened
> since February 2011, and she now had difficulty caring for her personal needs.
> The claimant testified that she could lift a gallon of milk, but she could not
> perform overhead reaching, and she stated that she sometimes experience spasms
> in her hands. Moreover, the claimant described ongoing drowsiness and dizziness
> related to a combination of poor sleep and medication side effects.
>
> The claimant's current allegations regarding her limitations have generally
> remained the same, although she vaguely testified that her pain has "gotten worse
> every year," although she did not describe functional limitations that have
> worsened over the course of the unadjudicated period. She testified that she has

> constant, widespread pain, especially in her knees and lumbar spine, which limit her mobility and her ability to perform even daily household tasks. She indicated that she uses a walker to move about in her home, but uses a cane and knee braces when she is outside of her home. She reported that she has received minimal relief of pain from her current treatment, including use of a TENS unit and NSAID pain medications. She reported that she could lift, but not carry a gallon of milk. She continued to report difficulty raising or reaching with the right arm. She indicated that she has sleep disturbance related to her pain, and naps during the day. She related that the most comfortable position is lying down, which she does at most times throughout the day.

(Tr. 98)

Finally, Brown contends that the ALJ erred in failing to find gout to be a new, severe impairment. However, the ALJ did consider Brown's gout, noting that there was only one incidence in the record of elevated uric acid levels supportive of gout. The ALJ also found that there was no evidence of "an ongoing presence of medical signs or symptoms related to gout that would cause additional work-related limitations." (Tr. 94) Brown largely cites her own complaints to medical providers that she was having gout pain. ECF Doc. 16, Page ID# 570. However, treatment notes from May 2014 state that Brown had no symptoms of gout at that time and that her diagnosis for gout was "not crystal proven." (Tr. 369-370) Brown later called Dr. Jayakar's office and told them she was having a gout flare in her big toe on June 25, 2014 (Tr. 362), and there is one record showing elevated uric acid levels on March 19, 2015. (Tr. 416) However, there are no other records showing any complaints to any medical providers of gout symptoms or flare ups. Accordingly, the ALJ's finding that there was no evidence that gout was causing ongoing medical signs or symptoms that would have caused additional work-related limitations was supported by substantial evidence. Further, because the ALJ considered Brown's claims regarding gout, any error in his failure to conclude gout was a severe impairment was harmless at most.

17

Brown has failed to present new and material evidence showing that her impairments had worsened to the point that her RFC had changed following the 2013 ALJ decision. ALJ Kearney's decision to adopt the RFC of ALJ Hixson was supported by substantial evidence in the record. The ALJ correctly applied the holding of *Drummond* and SSA Ruling 98-4(6).

## VII. Conclusion

Because the ALJ properly determined that the new evidence presented by plaintiff did not support a finding that plaintiff's condition had changed since the ALJ's 2013 decision, he was bound by that prior decision. The ALJ's finding regarding plaintiff's residual functional capacity was supported by substantial evidence in the record. Plaintiff has not met her burden under the law, and the final decision of the Commissioner is AFFIRMED. Plaintiff's complaint is dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: June 11, 2018

Thomas M. Parker
United States Magistrate Judge